cc: Judge Bob Cares

43

FILED
2012 OCT 25 A 11: 28
U.S. DIST. COURT CLERK
EAST. DIST. MICHIGAN
DETROIT

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

At Detroit, Michigan

| | |
|---|---|
| UNITED STATES, | ) No.98-80695 |
| Plaintiff, | ) |
| | ) Defendant's motion to |
| | ) vacate conviction. |
| | ) |
| Fawzi Mustapha Assi, | ) 28 USC § 2255 |
| Defendant, pro se. | ) |

---

I. INTRODUCTION.

1.1 COMES NOW, Fawzi Mustapha Assi (hereinafter "Defendant"), seeking specific relief in the form of vacation of conviction or lesser relief for lack of in personam jurisdiction, appearance of fairness, fair notice, void for vagueness, and misapplication of Sentencing Guidelines as they stood at time complained of.

1.2 This is a motion to vacate filed pursuant to 28 USC § 2255. Defendant's conviction is void ab initio and is not merely voidable.

1.3 Defendant's conduct did not offend the charging statute which requires that he "knowingly" provide material

support to a "foreign terrorist organization." (See 18 USC § 2339B, 1996 originally enacted version prior to any amendment). While accused of intending to ship certain equipment (GPS components, night vision goggles) from America to others in Lebanon, the Defendant knew them (Hizballah) to be engaged in legal conduct, such conducdt being self defense of Lebanon in an armed conflict against Israeli armed forces which were inside of Lebanon in violation of UN resolution #425, infra.

1.4 Hizballah was recognized as a governmental defense force and was defending Lebanon against an Israeli incursion into its sovereign territory when the Defendant allegedly sought to ship the subject materials.

1.5 This is not terrorism, and the charging statute fails to give fair notice of offending conduct.

1.6 Despite Defendant's demands for a presiding officer who was not Jewish, this obvious conflict of interest and clear basis for a presumption of partiality was ignored by the presiding trier of fact who refused to recuse himself when, in fact, his people were illegally inside Defendant's country and were at war with Defendant's people. The proceedings in this case lacked the appearance to which the Defendant was at all times emtitled, rendering his conviction a violation of due process and a miscarraige of justice.

1.7 At sentencing Defendant's sentence was enhanced under a provision (USSG § 3A4.1) which requires, as an essential element, that his conduct be an act of violence as well as a violation of criminal laws of the United States. However, no violence on Defendant's part was ever alleged, and the

organization to which he allegedly sought to supply material support was defending its homeland as recognized under UN Charter and was not in violation of laws of the United States.

1.8 This enhancement justified an increase of his sentence of approx. 80 months but was unlawful, rendering Defendant's sentence exceedingly harsh and unduly imposed, requiring resentencing.

## II. PROCEDURAL HISTORY.

2.1 Upon Defendant's plea agreement he was sentenced to 120 months in prison with two years of supervised release at his Dec. 12, 2008 sentencing hearing.

2.2 Defendant appealed to the Sixth Circuit Court of Appeals which upheld district court's finding of guilt and imposition of sentence.

2.3 Defendant's counsel, Margaret S. Reben, filed for certiorari on or about Dec. 7, 2011 to the US Supreme Court but was barred as untimely in a January of 2012 ruling.

2.4 The Defendant's possible default relating to any claim or claims herein is due to counsel's lack of diligence.

## III. ARGUMENTS & GROUNDS FOR RELIEF.

3.1 At all times during proceedings in district court, Defendant was prejudiced by factors outside of his control. District Judge, Gerald Rosen, had a duty to recuse himself

from this case due to his religious affiliations but refused, infecting the entire proceedings with the presumption of unfairness.

3.2 This issue was raised by the Defendant, not by his counsel, and was not raised on appeal. Counsel's failure to timely file in the Supreme Court cost the Defendant review at that level, forcing him to pursue contentions which may be similar to those already raised. Defendant is entitled to review on all claims presented herein, any default upon such having occurred due to factors beyond his control. Defendant's issues briefed herein are as follows:

1. Actual innocence claim is exception to procedural default; Defendant's claim is not barred. ¶¶ 3.3 to 3.9.

2. Essential elements issues - ¶¶ 3.10 to 3.44.

A. Scienter element is not met.

B. Self defense is not "terrorism."

C. USSG § 3A4.1's elements are not met.

3. Charging statute and USSG § 3A4.1 are void for vagueness. ¶¶ 3.45 to 3.71.

A. "foreign terrorist organization" element of charging statute is void for vagueness.

B. Scienter element in charging statute is void for vagueness.

4. Appearance of fairness is lost due to presiding officer's religious affiliations. ¶¶ 3.72 to 3.89.

Brief of the Issues:

1. Procedural default does not bar Defendant's actual innocence claim.

3.3 A default on constitutional claims will be excused if a defendant can "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," Coleman v. Thompson, 501 US 722, 750 (1991), which occurs when a "constitutional violation has probably resulted in the conviction of one who is actually innocent" of the offense that is the subject of the barred claim. (See Murray v. Carrier, 477 US 478, 496, (1986); Schlup v. Delo, 513 US 298, 324 (1995); House v. Bell, 547 US 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006)).

3.4 An objective factor outside the defendant's control (e.g., ineffective counsel or a basis for the claim that was previously unavailable) could constitute cause. (See Murray, at 488; McClesky v. Zant, 499 US 467, 497 (1991)); A defendant can meet the prejudice prong if he demonstrates "that the errors . . . worked to his actual and substantial disadvantage, infecting the entire [proceeding] with errors of constitutional dimensions. (See White v. Lewis, 874 F.2d 599, 603 (CA9 1989) (citing US v. Frady, 456 US 152, 170 (1982)).

3.5 A defendant can demonstrate a fundamental miscarriage of justice by "establish[ing] that under the probative evidence he has a colorable claim of factual innocence." (See Sawyer v. Whitley, 505 US 333, 339 (1992); Cooper v. Neven, 641 F.3d 322 (CA9 2010)).

3.6 Intending to join the Sixth Circuit Court and other

circuits, the Ninth Circuit stated in 2011, "It is difficult to imagine a stronger equitable claim for keeping open the courthouse doors than one of actual innocence, "the ultimatele equity on the prisoner's side." Withrow v. Wilson, 506 US 680, 700 [] (1993)." . . . "We hold that a credible claim of actual innocence constitutes an equitable [to this statute], and a petitioner who makes such a showing may pass through the Schlup gateway and have his otherwise time-barred claims heard on the merits. In recognizing an equitable exception based on a credible showing of actual innocence, we join three of our sister circuits on an issue that has divided the court of appeals. (footnote omitted) See Souter v. Jones, 395 F.3d 577, 602 (CA6 2005); Lopez v. Trani, 628 F.3d 1228, 1230-31 (CA10 2010); San Martin v. McNeil, 633 F.3d 1257, 1267-68 (CA11 2011))."

3.7 Defendant's guilt is not validly established under the district court's standard for determining the charging statute's scienter element, and the charging statute is void for vagueness as applied to the offending conduct. The Defendant is innocent.

3.8 In Menna v. New York, 423 US 61 (1975), at fn.2: "The point of these cases (citing Tollett, 422 US 258 (1973); Brady, 397 US 742 (1970); and McMann, 307 US 759 (1970)) is that a counseled plea of guilty is an admission of factual guilt so reliable that, where voluntary and intelligent, it quite validly removes the issue of factual guilt from the case. In most cases, factual guilt is a sufficient basis for the State's imposition of punishment. A guilty plea, therefore, simply renders irrelevant those constitutional

violations not logically inconsistent with the valid establishment of guilt and which do not stand in the way of conviction, if guilt is validly established. Here, however, the claim is that the State may not convict the petitioner no matter how validly his factual guilt is established. The guilty plea, therefore, does not bar the claim."

3.9 The record, as discussed, infra, proves that the Defendant's efforts were directed solely at aiding in the self defense of Lebanon against a military incursion by Israeli armed forces into its sovereign territory, and not at aiding other activity that might rightfully be termed "terrorism" against the Israeli government.

2. In personam jurisdiction is lacking, essential elements.

3.10 To be guilty of an offense the Defendant's conduct must meet all essential elements of the charging statute. (See In re Winship, 397 US 358, 364 (1970); Mathews v. US, 485 US 58, 64-65 (1988)).

3.11 A plea agreement is a contract and is enforced as such. (See US v. Lukse, 286 F.3d 906, 909 (CA6 2002) (citing US v. Robison, 924 f.2d 612, 613 (CA6 1991)); US v. Jones, 417 F.3d 547, 549 n.1 (CA6 2005); Ricketts v. Adamson, 483 US 1, 1 0-12, 97 L.Ed.2d 1, 107 S.Ct. 2680 (1987)).

3.12 In the absence of subject matter or personal jurisdiction, the judgment rendered is null and void, in accordance "with the long-standing and basic principle that subject matter jurisdiction cannot be conferred upon a court by consent of the parties." (See Merrill v. Petty, 83 US 338, 346, 21 L.Ed. 499 (1872)).

3.13 Jurisdictional defects can include the unconstitutionality of the charging statute as applied to a criminal defendant's conduct. (See US v. Mercer, 133 F.Supp. 288, 291 (CA9 1955); US v. Caperell, 938 F.2d 975, 977 (CA9 1991) (citing US v. Montilla, 870 F.2d 549 (CA9 1989) amended at 907 F.2d 115 (CA9 1990). See also Bond v. US, 131 S.Ct. 2355, 180 L.Ed.2d 269, USSC #09-1227 (June 16, 2011), Ginsburg, J., concurring opinion).

3.14 At the time of the conduct complained of the charging statute read as follows:

> 18 USC 2339B(a)(1) Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides paterial support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than ten years, or both.

A. The "knowingly" requisite to guilt is not manifest in the conduct of the Defendant or in the record.

3.15 At Defendant's plea hearing he was questioned by the Court as to his knowledge of Hizballah's designation by the State Department as a "foreign terrorist organization" which is one of the charging statute's elements. Begin excerpt of plea hearing, Nov. 27, 2007:

> Court: Did you know Hizballah had been designated as a foreign terrorist organization?

Defendant: At the time, no, your Honor.

Court: Did you know that Hizballah had engaged in what had been referred to as terrorist activities?

Defendant: I read about it. Yes, your Honor.

Court: Mr. Cares? (prosecutor)

Cares: If he had read about it then he knew. That would be satisfactory, your Honor.

Court: All right, All right. Mr. Assi, based on your testimony here in open court, I'm going to find two things.

First, I'm going to find that your testimony is given freely and voluntarily and is not the product of any coercion or duress.

Secondly, I am going to find that by your voluntary testimony, you have made out all the elements of the crime that you have pled guilty to. For both of these reasons, I'm going to accept your guilty plea now.

*End excerpt of plea hearing transcript, Doc. #141 p.39-40, Nov. 27, 2007.

3.16 This shows that the Court made the determination that any reference by anyone to Hizballah's activities as

"terrorism" constitutes fair notice and warning that Hizballah had either been designated by the State Department as a terrorist organization, or that it had engaged or engages in terroristic activities, a fortiori, Defendant is to believe everything he reads, regardless of who the author was.

3.17 As the charging statute stood at the time complained of, it contained no definition of the term "foreign terrorist organisation," and in this case a journalist's reference to Hizballahs's activities is held to be that edfinition. Further, "knowingly" had not been statutorially defined to include instruction that anything in print is to be construed to constitute legal advice as to the elements of § 2339B.

3.18 This is not a valid basis for a determination that Defendant acted "knowingly." Under the instant standard, however, Defendant is presumed to know such a designation of or terrirstis acts by Hizballah merely by virtue of somebody in the private sector, a reporter, having referred to Hizballahs' activities as terrorism. (See sentencing hearing transcript, Doc. #163 at p.34 ln.18-24, Defendnant states exactly this to the Court). Defendant continues:

> "In this case, Defendant did not know that [what] he was doing was illegal and did not know that Hizballah was designated by the State Department as a terrorist organization.
>
> Had the Defendant sent these items to any other group other than Hizballah, everything would have been okay.
>
> The Defendant intneded to support a legitimate

resistance acting in self defense where such conduct is not forbidden or prohibitive [sic], but rather legitimate and innocent."

See sentencing transcript, Doc. #163 at p.35 ln,11 to p.36 ln.1. Further, in defense counsel's examination of FBI agent:

Q to FBI: Then when Mr. Assi engaged in the dialogue relating to the United State targets, did he indicate to you that he didn't know whether or not the targets were done by Hizballah?

But if they were done and did he answer his question in that fashion or did he say that he knew?

FBI: He did not say he knew.

Q to FBI: He was --- he was assuming what it was that you were saying was true; and if it was true, this is my response.

FBI: I believe the conventional wisdom at the time that Hizballah had attacked those targets. He accepted that conventional wisdom.

Q to FBI: If it were true?

FBI: Correct.

Q to FBI: But he didn't aspouse any personal knowledge of that?

FBI: No, he did not.

See Doc. #147 transcript of FBI examination at sentence hearing June 23, 2008, at p.73 ln.5-23.

3.19 The Defendant answered expressly in the negative regarding the question of whether or not he was aware of such designation, and said only that he may have read something about Hizballah in a newspaper, and no further inquiry was conducted as to the element of "knowingly."

3.20 It was established at this point that the Court lacked in personam jurisdiction but it nevertheless proceeded to the sentencing of the Defendant.

3.21 Inasmuch as Defendant does not meet the "knowingly" element of the charging statute, his conviction must be vacated.

B. The charging statute wrongfully characterizes self defense as a "federal crime of terrorism."

3.22 Defense of one's country and fellow citizens against lawlessness is the right of all people.

"It is the duty and right, not only of every peace officer of the United states, but of every citizen, to assist in prosecuting, and in securing the punishment of, any breach of the peace of the United States."

See Foss v. US, 266 F. 881 (1920) (citing Quarrells & Butler, 158 US 532, 15 S.Ct. 959, 39 L.Ed. 1080).

3.23 It is no different in Lebanon, yet here it is held against the Defendant that his country had no formal army but only Hizballah to protect it from the Israeli incursion. (See Doc. #147 at p.150-151, and 182-184, expert witness testimony).

3.24 Nowhere in these proceedings has the Plaitiff charged that Lebanon has no right to protect itself against the subject incursion, that such conduct or activity is unlawful in any way.

3.25 And just as the Israeli army is deemed to be the Israeli government in this instance, so must Hizballah be deemed to be the Lebanese government at times spent in self defense of Lebanon, for it was Lebanon's sole defense force at the times complained of.

3.26 The Chief of Staff of the Lebanese Army, who later became President of Lebanon, specifically referred to Hizballah as the resistance of Lebanon. (See Doc. #147 at p.183).

3.27 The right of self defense in and of one's own country does not extend solely to a formal military, but to all citizens and residents thereof. (See Ex.B).

3.28 Plaintiff controverts this standard by arguing that the Defendant "was not acting on behalf of the nation of Lebanon. He was actively supporting a foreign terrorist organization, designated as such by the United States Department of State." (See Plaintiff's reply memorandum Doc.

#6110626237 filed 5/12/2010 at p.19).

3.29 The Plaintiff's characterization of self defense as "retaliation" is the crux of the case against the Defendant; self defense is a right of people and of nations. The Plaintiff's having branded Hizballah as it has deligitimizes activities which are perfectly legitimate and, in this instance, essential to the health and safety of the citizens of Lebanon who were under military attack by troops armed with state of the art weaponry the Plaintiff itself provided to Israel.

3.30 This undue and over reaching stigmatization of Hizballah is Plaintiff's attempt to render useless Lebanon's only defenses against a military incursion which constituted a plain violation of UN Resolution. Plaintiff's assertion that Defendant should have sought to supply the Lebanese government with aid and allow it to supply Hizballah is a trivial interruption of Defendant's logicl approach to aiding his countrymen and would not occur to any reasonable individual to be a lawful requirement or concern.

3.31 Plaintiff's application of 18 USC § 2339B to the conduct complained of is misapplication, it is over reaching beyond the intended scope of the statute, and it bars the right of self defense of Defendant's countrymen, and is therefore unde, requiring vacation of Defendant's conviction.

C: Essential elements of USSG § 3A4.1 are not met.

3.32 The Defendant's sentence was enhanced under USSG § 3A4.1 which reads as follows:

§ 3A4.1. Terrorism.

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less that level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

18 USC § 2332(g)(5) "Federal crime of terrorism" means an offense that -

(a) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, and

(b) is a violation of . . .

(i) . . . [18 USC] § 2339B.

3.33 The enhancement clearly applies only if Hizballah's defense of Lebanon constitutes a "federal crime of terrorism." For this assertion to be valid, Israeli troops illegally inside of Lebanon must duly constitute "government"; Lebanon had its own government. Further, self defense of Lebanon by its people must duly constitute a "federal crime of terrorism."

3.34 "[T]he conduct of government," as it relates to the conduct of Israel, was war, against which the Lebanese people, including those in Hizballah, had a right to act with equal

force. Defendant charges that Israel's illegal incursion into Lebanon and its making of war inside of Lebanon does not constitute "government conduct."

3.35 Stripped of ambience through analogous platitudes, this assertion is tantamount to the claim that, because the assailant was a public servant, the rape victim had no right to defend herself, that governmental operations include the overtly unlawful acts of its agents.

3.36 Defendant's alleged offense is as slight as having sought to ship to Hizballah instead of to the Lebanese government so it could then forward the shipment fo Hizballah. ("[H]e was not sending military-grade material to the government of Lebanon; he was sending it to Hizballah[.]" See Gov't reply Doc. #6110626237 p.15).

3.37 Just as materials to indoctrinate youth do not offend § 2339B, providing materials to support legitimate and non-terroristic uses does not offend, e.g., self defense. (See Gov't reply Doc.#6110626237 at p.15).

3.38 Hizballah was acting on behalf of the nation of Lebanon at all times complained of. "The evidence of intimidation or coercion - or retaliation against Israeli government" concerned only self defensive attemps merely to cause its withdrawl from Lebanon. (See Doc. #153 Findings of Fact and Conclusions of Law Regarding Applicability of § 3A4.1 of [USSG] at p.16-17).

3.39 Unless defending one's country against a military incursion by a foreign government is unlawful, which it is not, Defendant cannot be said to be providing material support to a terrorist organization when merely seeking to aid in such

self defense of his country.

3.40 The court's application of § 3A4.1 renders all acts on the part of Lebanon to defend itself against invasion a "federal crime of terrorism." This is an absurd result of this case, branding the government of Lebanon a "foreing terrorist organization," and reclassifying legitimate self defense on the part of Lebanon as the "intimidation or coercion" of the Israeli government, thus criminalizing Lebanon's material support of its sole defense force, Hizballah.

3.41 Compare this result to UN Security Council's Resolution 425 (March 19, 1978) and UN Charter Article 51:

"The Security Council, Taking note of the letters from the Permenant Representatives of Lebanon and Israel, having heard the statement of the Permenant Representatives of Lebanon and Israel,

1. Calls for strict respect for the terretorial integrity, sovereignty and political independence of Lebanon within its internationally recognized boundaries;

2. Calls upon Israel immediatly to cease its military action against Lebanese territorial integrity and withdraw forthwith its forces from all Lebanese territory[.]" (See Ex.A hereto).

UN Charter says:

"Nothing in the present Charter shall impair the

inherent right of individual or collective self defense if an armed attack occurs against a Member of the United Nations, until the Security Council has taken measures necessary to maintain international peace and security[.] [remainder of article 51 omitted]." (See Ex.B hereto).

"The defense of lack of subject matter jurisdiction cannot be waived," Augustine v. United States, 704 F.2d 1074, 1077 (CA9 1983), and may "be raised at any time during the proceedings," United States v. Bennett, 147 F.3d 912, 914 (CA9 1998) (internal quotations omitted). Furthermore, because federal courts posses "only power that is authorized by Article III of the constitution, and the statutes enacted by Congress pursuant thereto[.] . . . every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of lower courts in a cause under review," even if it is not contested by the parties. Bender v. Williamsport Area Sch. Dist., 475 US 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)."

See Hansen v. Dept. of Treasury, 528 F.3d 597, 600 (CA9 2007); see also Kuntz v. Lamar Corp., 385 F.3d 1177, 1180 (CA9 2004) (citing US v. Cotton, 535 US 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)).

3.42 When a statute does not reach the conduct allegedly constituting the offense with which Defendant is charged, what

is the source of the power that binds the defendant to the sentence in this case?

3.43 Supplying material support to those in due self defense of their country is not "a federal crime of terrorism," and an illegal armed invasions of Lebanon is not mere "government conduct" but rather is unlawful violence in and of itself.

3.44 The USSG § 3A4.1 enhancement to Defendant's sentence is also void as applied to the conduct complained of, making his sentence illegal, requiring that this enhancement be removed and that he be resentenced.

3. Void for vagueness and fair warning, conviction and enhancement.

A. Charging statute is void for vagueness as applied to offending conduct.

3.45 Defendant was charged under a statute that prohibits "knowingly" providing material support to an organization that either has been designated by the US State Department as a "terrorist organization," or which engages in or has engaged in terrorist activities."

> 18 USC § 2339B(a)(1) Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than ten

years, or both.

3.46 The void for vagueness doctrine provides that one must know BY READING STATUTE what conduct is proscribed, and the 1996 statute makes no reference to the Federal Register, or to newspapers, leaving the Defendant with having to guess as to which groups are and are not so designated or which do and do not duly qualify as a "foreign terrorist organization."

3.47 The amendments made to the charging statute after its enactment (after Defendant's arrest but before his proceedings) expose the Plaintiff's beliefs, and those of Congress, that the statute lacked clarity and needed to be claified and expanded upon so as to clearly identify the conduct sought to be prohibited.

3.48 Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." (See US v. Williams, 553 US 285, 128 S.Ct. 1830, 1845 (2008)). "Vague statutes are invalidated for three reasons: (1) to avoid punishing people for behavior that they could not have known was illegal; (2) to avoid subjective enforcement of laws based on arbitrary and discriminatory enforcement by government officers; and (3) to avoid any chilling effect on First Amendment freedoms." (See Humanitarian Law Project, v. Mukasey, 552 F.3d 916, 928 (CA9 2009) (quoting Foti v. City of Menlo Park, 146 F.3d 629, 638 (CA9 1998); see also US v. Purdy, 264 F.3d 809, 811 (CA9 2001)).

3.49 A statute is unconstitutional on its face if it

"fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes and encourages seriously discriminatory enforcement." (See Williams, supra, at 1845).

3.50 "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to know what the State commands or forbids." (See Lanzetta v. New Jersey, 306 US 451, 453 (1939)). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential element of due process of law." (See Connally v. General Const. Co., 269 US 385, 391 (1926)).

3.51 "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendant subjected to them. [] This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, is subject to punishment that is not clearly prescribed." (See United States v. Santos, 553 US __, 128 S.Ct. __, 170 L.Ed.2d 912, 920 (2008) (citing US v. Gradwell, 243 US 476, 485, 37 S.Ct. 407, 61 L.Ed. 857 (1917); McBoyle v. US, 283 US 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931); US v. Bass, 404 US 336, 347-349, 92 S.Ct. 515, 30 L.Ed. 488 (1971)).

3.52 "When interpreting a criminal statute, we do not play the part of a mind reader. In our seminal rule-of-lenity decision, Chief Justice Marshall rejected the impulse to speculate regarding dubious congressional intent.

"[P]robability is not a guide which a court, in construing a

penal statute, can safely take." United States v. Willberger, 5 Wheat. 76, 105, 5 L.Ed. 37 (1820). And Justice Frankfurter, writing for the Court in another case, said the following: "When Congress leaves to the judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." Bell v. United States, 349 US 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955)." (See Santos, Id., at 920-21). "We interpret ambiguous criminal statutes in favor of defendants, not prosecutors." (Id., at 923). (See also, Liparota v. US, 471 US 419, 441 (1985) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."); Kolender v. Lawson, 461 US 352, 375 (1982) ("We conclude [this statute] is unconstitutionally vague on its face because it encourages arbitrary enforcement[.]"); US v. Lanier, 520 US 259, 265 (1997) ("To make the warning fair, so far as possible the line should be clear." (citing McBoyle v. US, 283 US 25, 27, 75 L.Ed 816, 51 S.Ct. 340 (1931)); Lambert v. California, 355 US 225, 229 (1957) ("[W]here there was no proof of the probability of such knowledge, he may not be convicted consistently with due process.").

B. Vagueness - Scienter requirement of charging statute.

3.53 To say as Plaintiff has, that Defendant's reading anything in print from the American media suffices to define prohibited conduct, is utterly absurd. Journalists have never been held up as legal experts and cannot be said to be reliable sources of legal advice.

3.54 FURTHER, any reference by the media to Hizballahs's activities, or anyone's activities, as "terrorism" is

rightfully viewed under the presumption that the reporting journalist is sensationalizing to a degree which could very well be a substantial, if not tremendous; sell papers.

3.55 On 18 USC § 2339B's element of "knowingly," consider US v. Abdi, 498 F. Supp.2d 1048 (USDC E.D. of Ohio July 23, 2007).

3.56 This is a pretrial ruling regarding motions on the part of both the Plaintiff and the Defendant relating to various matters. Defendant Abdi was challenging his count two which charged him with a violation of 18 USC 2339B, the charging statute in the instant case. His charge involved providing material support in the form of personnel to a terrorist organization.

3.57 In the Abdi ruling a full discussion of the "knowingly" element of § 2339B reveals many interesting aspects of interpretation and intent of the statute and its scienter element. (See Id., at 1058-1061).

3.58 As shown, supra, the Defendant was found to have acted "knowingly" by virtue of the fact that he may have read a newspaper reporter's perception that the nature of Hizballah's activities were, at times, deemed "terrorism" by that reporter.

3.59 The court made no inquiry as to whether the Defendant read that reference before of after the times complained of which, if after said times, relieves the Defendant of the allegation that he had any prior knowledge of any kind. (See ¶ 3.15, supra).

3.60 Arguendo, if Defendant had read a reporter's perception prior to the conduct complained of, what burden of

expectation does it place upon him in relation to a reference to Hizballah made by a newspaper reporter? With this as the standard to establish "knowingly" in this case the Defendant is required to believe eveything he reads in a newspaper as truth, and to ignore everything he hasn't read in a newspaper as probable falsehood. When one publication contradicts another in diametric opposition, the Defendant is to believe both of them; Obama did and did not choose scores of bona fide Marxists and communists as cabinet members after commencement of his presidency.

3.61 Never and nowhere, to the best of Defendant's knowledge, has the Plaintiff published a list of publications that are to be believed in all that they say and of those who are lying in every line of text; who is the Defendant to believe? What if the reference to Hizballah he might have read in a newspaper was in a publication of prevarication(s)?

3.62 To base a determination of prior knowledge on whether one has read the correct newspaper, places the Defendant in the impossible position of having to view news articles as truth and legal advice, and having to choose correctly when publications convey opposing opinions of world events. This is not due process. From the Abdi decision:

> "Knowingly," the key term in analyzing the level of mens rea in this statute, can be read in either of two ways: (1) as only modifying the verb "provides," or (2) as modifying "provides" as well as the remaning elements in the statute. United States v. Marzook, 383 F.Supp.2d 1056, 1069

> (N.D.III. 2005)." 'Congress certainly intended by the use of the word 'knowingly' to require some mental state with respect to some element of the crime,' but either interpretation would 'accord with ordinary usage.' " Id. (quoting Liparto v. US, 471 US 419, 424-25, 105 S. Ct. 2084, 85 L.Ed.2d 434 (1985)). Several interpretations arose in relevant case law due to the ambiguity in hte statute. Id. (providing the various interpretations)."

See Abdi, Id., at 1060. This decision resumes with an accounting of the three different interpretations:

> "The first interpretation requires the government to prove only that a defendant knowingly provided material support to an organization, regardless of whether a defendant knew the organization was designated FTO of engaged in terrorism. [] The second interpretation requires the government to prove both that defendant knowingly provided material support, and that he knew the organization was either a designated FTO or engaged in terrorism [] The third interpretation requires the government to prove that the defendant knowingly provided material support, knew the organization was either a designated FTO or engaged in terrorism, and specifically intended to further the organization's terrorist activities. See United States v. Al-Arian, 308 F.Supp.2d 1322, 1338-39 [M.D.

Florida 2004] (holding that the government not only must prove that the donor knew the recipient was an FTO, but also that the donor specifically intended to further the terrorist activities of the organization); Marzouk, 383 F.Supp.2d at 1070 (stating that such interpretation would allow a defendant to contribute material support with impunity to any number of organizations that engage in terrorist activity, so long as the defendant did not know that the Secretary of State had designated the recipient an FTO)."

See Abdi, Id., at 1060.

"Of these interpretations, this Court agrees with the second reasoning, as set forth by Marzook, which requires the government to prove that Defendant knowingly provided material support and that he knew that the organization (al Qaeda) was either a designated FTO or engaged in terrorist activities. Although reached independently, this conclusion comports with Congress' December 17, 2004 passage of IRTPA, in which Congress clarified § 2339B's scienter requirement[.]"

See Abdi, Id., at 1060.

3.63 What the Defendant finds striking about the standard under which he was found to have acted "knowingly" is that, in Abdi, in 2007, a district court on the 6th Circuit was

choosing from among three different interpretations and doing so "independently," without the benefit of any judicial precedent, but rather by the application of a 2004 amendment of the statute, doing so a full ten years after the conduct complained of in this case, in 2007.

3.64 For a full ten years after the Defendant's alleged affense, judges were still in disagreement as to how to interpret the charging statute's "knowingly" element. Yet, because the Defendant might have read a reference to Hizballah in a newsparer he's presumed to know the Plaintiff's view of t he organization.(?) The Abdi court resumes, on p.1061:

> "Thus, the Court finds, under either the former or new version of the statute, the prosecution must not only prove that Defendant knowingly provided material support to al Qaeda, but also that Defendant knew either that al Qaeda engaged or engages in terrorism or terrorist activities. while Congress added the scienter requirement after Defendant's indictment, the defenition largely tracked prior judicial decisions concerning the requirement and was later included to eliminate the uncertainty created by the abberant Al-Arian decision. See Humanitarian Law Project v. Gonzales, 380 F.Supp.2d 1134, 1147 (C.D. Cal. 2005) (viewing legislation as a rejection of the Al-Arian ruling)[.]"

See Abdi, Id., at 1061.

3.65 Although now deemed "abberant," the Al-Arian

decision is from 2004, a full seven years after the conduct complained of in htis case, and the Abdi court, a district court, chooses the second interpretation "independently" in 2007.

3.66 When judges of the United States are at a loss for an appropriate interpretation of the charging statute for ten years, and when it takes Congress to clarify its intent to relieve judicial quandry, where is the individual who is supposed to be able to know what is proscribed by his mere reading of the statute alone? How does this Court hold an individual to the language of a charging statute upon which even the courts fail to agree without further guidance, and amendments to the statute itself, from and by Congress? "Several interpretations arose in relevant case law due to the ambiguity in the statute." (Abdi, Id. at 1060).

3.67 The Court's query to the Defendant to which he repllied that he may have read about Hizballah's activities being terroristic was a full ten years after the conduct complained of (2007) and the court did not ask if Defendant had such knowledge at the time of the conduct complained of:

> Court: Did you know that Hizballah had engaged in what had been referred to as terrorist activities?
>
> Defendant: I read about it. Yes, your Honor.

See ¶ 3.15, supra.

3.68 Read about it, in a newspaper, but at what time, before or after the conduct complained of? when the FBI spoke

to the Defendant he said that he had no such knowledge at all. ("He did not say he knew." See transcript excerpt at ¶ 3.18, supra).

3.69 The Abdi court states outright that the statute (18 USC § 2339B) is ambigious, "Several interpretations arose in relevant case law due to the ambiguity in the statute." (498 F.Supp.2d at 1060).

3.70 And in at least one court (Al-Arian, cited in Abdi, Id., at 1060 "Third interpretation"), the Defendant would also have to have intended his support to further terroristic activities to rightfully be deemed to have acted "knowingly." The Abdi court says that the 2004 legislative amendments rejected the Al-Arian decision, seven years after the conduct complained of.

3.71 Under the charging statute, at the time complained of, what was and what was not "knowingly" was entirely unresolved, and unknowable, and even a district judge admits to statutory ambiguity. The basis for district court's determination that the Defendant, acted "knowingly" at the time complained of is insufficient to satisfy due process requirements concerning vagueness and fair warning doctrines, requiring vacation of his conviction.

4. Appearance of fairness, impartiality.

3.72 Defendant charges that district court's Judge Gerald Rosen had a duty to recuse himself for the conflict of interest arising from his religious affiliations; he's Jewish.

28 USC § 455. Disqualification of justice, judge, or magistrate.

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidendiary facts concerning the proceeding[.]

3.73 Defendant claims that trial judge, G. Rosen, had a duty to recuse himself for possible bias, partiality, and the resultant inability to preserve the appearance of fairness at all times after and prior to Defendant's request that he assign this case to another judge. Review is under abuse of discretion standard. (See Ullmo ex. rel. Ullmo v. Gilmore Acadamy, 273 F.3d 671 (CA6 2001) (citing US v. Hartsel, 199 F.3d 812, 815 (CA6 1999)).

3.74 A reviewing court must have a "definite and firm conviction that the trial court committed a clear error of judgement" before reversing under the abuse of discretion standard. (See Logan v. Dayton Hudson Corp., 865 F.2d 789, 790 (CA6 1989)).

3.75 Construed in para materia with 28 USC § 455 is 28 USC § 144. (See Story, 716 F.2d 1088, 1091 (CA6 1983)). The alleged bias must "stem from an extrajudicial source and

result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." (See US v. Grinnell Corp., 384 US 563, 583, 16 L.Ed.2d 778, 86 S.Ct. 1698 (1965)).

3.76 Extra judicial conduct encompasses only "personal bias as distinguished from a judicial one, arising out of the judge's background and association and not from the judge's view of the law." (See US v. Story, 716 F.2d 1088, 1090 (CA6 1983)). "Personal" bias is prejudice that emanates from some source other than participation in the proceedings or prior contact with related cases. (See Wheeler v. Southland Corp., 875 F.2d 1246, 1251-52 (CA6 1989) (citing Demjanjuk v. Petrovsky, 776 F.2d 571, 577 (CA6 1985)).

3.77 At the time of Defendant's alleged offence, the Jewish state of Israel had occupied his homeland of Lebanon with armed forces and were engaged in an armed conflict with forces (Hizballah) seeking to defend Lebanon against said incursion, inside the geographic and political boundaries of Lebanon.

3.78 The trial judge, G. Rosen, is or was a Jew and, as such, was at the time of Defendant's pretrial proceedings an ally of Israel and its government, which was at war with the Defendant and his countrymen. The Defendant did not merely slander this judge, and this judge did not have a mere pecuniary interest in the outcome, instead they were for all intents and purposes representatives of opposing warring factions. Defendant was acting for those within his own homeland's borders while judge Rosen's associates were an invading force outside of its own borders seeking to harm an

disarm Defendant's countrymen despite UN Resolution 425, supra, which instructed Israel to honor Lebanon's terretorial integrity.

3.79 This conflict is tantamount to having a judge whose church was burned to the ground presiding in the arson trial of the accused, or having a black judge presiding over one accused of providing the Ku Klux Klan with material support.

3.80 The Defendant's countrymen and Rosen's congregation have been warring literally for decades. A Jew presiding over one accused of providing material support to defenders of Lebanon while it is under attack from Israel is reasonably seen as having set an entirely new standard or precedent so flagrant as to defy description, an eclipse of all previous examples.

3.81 Conduct which the Defendant feels exemplifies the reasons for his concerns and his perception of bias and partiality include but are not limited to the following:

1. Judge recieved "supplemental sentencing memorandum" concerning misapplication of USSG § 3A4.1 but never ruled on it. Later attached to the PSI. (Ruling Doc. #177 (3/11/10)). Order (Doc. #177) states that issues had been addressed or ruled upon, which is a false statement.

2. Defendant sought to have judge investigated for conflict(s) of interest, FBI interfered, threatened Defendant's children at his home.

3. Defendant asked judge to recuse because of religious

affiliations and was refused.

4. Defendant's motion arguing that the charging statute is unconstitutional (mailed Dec. 7, 2008 and filed Dec. 29, 2008) as applied remained unaddressed, judge falsely stated in Doc. #158 at fn.1 that it had been addressed.

5. Relevant part of record sealed. This concerned Defendant's argument for recusal. Defense counsel recounted to the Defendant the opinion of other attorneys who were demonstrative in their perception that G. Rosen could never treat this case or the Defendant fairly.

6. Used new and amended statute and not solely the statute as it stood at the times complained of.

7. Judge used expert testimony in piecemeal, ruling that the expert said Hizballah was not part of Lebanon's government while ignoring later testimony about the group's having been acknowledged as legitimately acting on behalf of Lebanon. (Findings of Fact/Conclusions of Law Doc. #153 p.10 (10/17/08)).

8. Judge made no reference to UN Resolution #425 or the UN Charter when, in fact, Defendant's core arguments relied in part upon international law.

9. Judge held that whatever a newspaper journalist says about Hizballah is to be deemed as truth by the Defendant.

3.82 Recusal requires an allegation of "fact which a reasonable person would believe indicate a judge has a personal bias against the moving party." (See Gen. Aviation, Inc. v. Cessna Aircraft, Co., 915 F.2d 1038, 1043 (CA6 1990)).

3.83 In matters of ethics, appearance and reality often converge as one. (See Offutt v. US, 348 US 11, 14, 99 L.Ed. 11, 75 S.Ct. 11 1954) ("[J]ustice must satisfy the appearance of justice"); Ex parte McCarthy, [1924] 1 KB 256, 259 (1923) ("[J]ustice should not only be done, but should manifestly and undoubtedly be seen to be done")).

3.84 The appearance of fairness and neutrality are not satisfied by the bare possibility of a fair hearing. (See Marshall v. Jericho, Inc., 446 US 238, 242, 64 L.Ed.2d 182, 100 S.Ct. 1610 (1980) (noting the importance of 'preserv[ing] both the appearance and reality of fairness," which " 'generat[es] the feeling, so important to popular government, that justice has been done' ") (quoting Joint Anti-Fascist Refugee Comm. v. McGrath, 341 US 123, 172, 95 L.Ed. 817, 71 S.Ct. 624 (1951) (Frankforter, J., concurring)).

3.85 Recusal is required where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." (Withrow v. Larkin, 421 US 35, 47, 43 L.Ed.2d 712, 95 S.Ct. 1456 (1975);

3.86 When the question of recusal under § 455(a) is close, the decision tips in favor of recusal. (See Sao Paulo v. Am. Tobacco Co., 535 US 229 (2002); US v. Dandy, 998 F.2d 1344, 1349 (CA6 1993); Nicholas v. Alley, 71 F.3d 347, 352

(CA10 1995); US v. Patti, 337 F.3d 1317, 1321 (CA11 2003); see also Caperton v. A.T. Massey Coal Co., Inc., 566 US __, 173 L.Ed.2d 1208, 129 S.Ct. __ (Dec. 8, 2009) (State Supreme Court Justice refused to recuse despite having recieved campaign donations from party in interest); Mayberry v. Pennsylvania, 400 US 455, 466, 27 L.Ed.2d 532, 91 S.Ct. 499 (1971) (state judge slandered by criminal defendant should have recused from that defendant's contempt proceedings)).

3.87 Rosen's failure to recuse himself from this case was a clear error of judgment, and the very nature of the prejudice alleged by the Defendant is charged with emotion, spite, and malice and is born of literally decades of armed conflict between Israel and Lebanon.

3.89 District Judge, Gerald Rosen, had a duty to recuse himself. His failure to do so destroyed the appearance of fairness to which the Defendant is entitled. Due process requires that Defendant's conviction be vacated.

3.90 Appointed counsel, James Thomas, had a duty to make this challenge for the Defendant but failed to do so.

IV. CONCLUSION & VERIFICATION.

4.1 Defendant has shown that the basis for his conviction is wholly invalid. The standard for scienter and the view of self defense as a federal crime of terrorism are, in this instance, are strained at best, and are nothing the individual of ordinary intelligence could have known prior to the conduct of which the Defendant is accused.

4.2 The prejudice of the trial judge allows for the

presumption of unfairness and partiality, rendering all proceedings null and void. Defendant is entitled to vacation of his conviction as a matter of law and of fundamental right.

4.3 Defendant requests that this Court schedule the necessary hearings concerning adjudication of the claims briefed herein.

4.4 Defendant requests leave to amend this motion if it is deemed deficient or in the event he obtains counsel to represent it to the Court.

4.5 Defendant requests that the Court appoint an attorney to this case to build the record in advance of any future proceedings.

4.6 Defendant anticipates that he will need to supplement this filing with a further briefing of one or more issues contained herein.

4.7 Defendant requests an order directing that discovery is allowed as of the Court's receipt of this motion.

4.8 I, Fawzi Mustapha Assi, do hereby declare under penalties of perjury (28 USC § 1746) that the foregoing statements are true and correct to the best of my knowledge and belief, and that the exhibits attached hereto are authentic and have not been misrepresented in any way. Excuted this 22nd day of October, 2012.

______________________

Fawzi Mustapha Assi, Affiant

Respectfully Submitted:

Fawzi M. Assi
FAWZI M. ASSI

Fawzi Mustapha Assi

cc. Judge
Bob Cares

Attachment (A)

UNITED
NATIONS

S

# Security Council

S/RES/425 (1978)
19 March 1978

**Resolution 425 (1978)**
**of 19 March 1978**

*The Security Council,*

*Taking note* of the letters from the Permanent Representative of Lebanon 1/ and from the Permanent Representative of Israel, 2/

*Having heard* the statement of the Permanent Representatives of Lebanon and Israel, 3/

*Gravely concerned* at the deterioration of the situation in the Middle East and its consequences to the maintenance of international peace,

*Convinced* that the present situation impedes the achievement of a just peace in the Middle East,

1. *Calls for* strict respect for the territorial integrity, sovereignty and political independence of Lebanon within its internationally recognized boundaries;

2. *Calls upon* Israel immediately to cease its military action against Lebanese territorial integrity and withdraw forthwith its forces from all Lebanese territory;

3. *Decides,* in the light of the request of the Government of Lebanon, to establish immediately under its authority a United Nations interim force for Southern Lebanon for the purpose of confirming the withdrawal of Israeli forces, restoring international peace and security and assisting the Government of Lebanon in ensuring the return of its effective authority in the area, the Force to be composed of personnel drawn from Member States;

4. *Requests* the Secretary-General to report to the Council within twenty-four hours on the implementation of the present resolution.

*Adopted at the 2074th meeting by 12 votes to none, with 2 abstentions (Czechoslovakia, Union of Soviet Socialist Republics).* 4/

*Notes*

1/ *Ibid.*, documents S/12600 and S/12606.

2/ *Ibid.*, document S/12607.

3/ *Ibid.*, *Thirty-third Year,* 2071st meeting.

4/ One member (China) did not participate in the voting.

Ex. A

Item No. 16

## CHARTER OF THE UNITED NATIONS

### PREAMBLE

WE THE PEOPLES OF THE UNITED NATIONS DETERMINED to save succeeding generations from the scourge of war, which twice in our lifetime has brought untold sorrow to mankind, and to reaffirm faith in fundamental human rights, in the dignity and worth of the human person, in the equal rights of men and women and of nations large and small, and to establish conditions under which justice and respect for the obligations arising from treaties and other sources of international law can be maintained, and to promote social progress and better standards of life in larger freedom, AND FOR THESE ENDS to practice tolerance and live together in peace with one another as good neighbours, and to unite our strength to maintain international peace and security, and to ensure, by the acceptance of principles and the institution of methods, that armed force shall not be used, save in the common interest, and to employ international machinery for the promotion of the economic and social advancement of all peoples, HAVE RESOLVED TO COMBINE OUR EFFORTS TO ACCOMPLISH THESE AIMS

Accordingly, our respective Governments, through representatives assembled in the city of San Francisco, who have exhibited their full powers found to be in good and due form, have agreed to the present Charter of the United Nations and do hereby establish an international organization to be known as the United Nations.

### CHAPTER I

### PURPOSES AND PRINCIPLES

*Article 1*

The Purposes of the United Nations are:

1. To maintain international peace and security, and to that end: to take effective collective measures for the prevention and removal of threats to the peace, and for the suppression of acts of aggression or other breaches of the peace, and to bring about by peaceful means, and in conformity with the principles of justice and international law, adjustment or settlement of international disputes or situations which might lead to a breach of the peace;
2. To develop friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples, and to take other appropriate measures to strengthen universal peace;
3. To achieve international co-operation in solving international problems of an economic, social, cultural, or humanitarian character, and in promoting and encouraging respect for human rights and for fundamental freedoms for all without distinction as to race, sex, language, or religion; and
4. To be a centre for harmonizing the actions of nations in the attainment of these common ends.

---

Credit: United Nations Web Site.

Ex. B

*Article 37*

1. Should the parties to a dispute of the nature referred to in Article 33 fail to settle it by the means indicated in that Article, they shall refer it to the Security Council.

2. If the Security Council deems that the continuance of the dispute is in fact likely to endanger the maintenance of international peace and security, it shall decide whether to take action under Article 36 or to recommend such terms of settlement as it may consider appropriate.

*Article 38*

Without prejudice to the provisions of Articles 33 to 37, the Security Council may, if all the parties to any dispute so request, make recommendations to the parties with a view to a pacific settlement of the dispute.

## CHAPTER VII

## ACTION WITH RESPECT TO THREATS TO THE PEACE, BREACHES OF THE PEACE, AND ACTS OF AGGRESSION

*Article 39*

The Security Council shall determine the existence of any threat to the peace, breach of the peace, or act of aggression and shall make recommendations, or decide what measures shall be taken in accordance with Articles 41 and 42, to maintain or restore international peace and security.

*Article 40*

In order to prevent an aggravation of the situation, the Security Council may, before making the recommendations or deciding upon the measures provided for in Article 39, call upon the parties concerned to comply with such provisional measures as it deems necessary or desirable. Such provisional measures shall be without prejudice to the rights, claims, or position of the parties concerned. The Security Council shall duly take account of failure to comply with such provisional measures.

*Article 41*

The Security Council may decide what measures not involving the use of armed force are to be employed to give effect to its decisions, and it may call upon the Members of the United Nations to apply such measures. These may include complete or partial interruption of economic relations and of rail, sea, air, postal, telegraphic, radio, and other means of communication, and the severance of diplomatic relations.

*Article 42*

Should the Security Council consider that measures provided for in Article 41 would be inadequate or have proved to be inadequate, it may take such action by air, sea, or land forces as may be necessary to maintain or restore international peace and security. Such action may include demonstrations, blockade, and other operations by air, sea, or land forces of Members of the United Nations.

*Article 43*

1. All Members of the United Nations, in order to contribute to the maintenance of international peace and security, undertake to make available to the Security Council, on its call and in accordance with a special agreement or agreements, armed forces, assistance, and facilities, including rights of passage, necessary for the purpose of maintaining international peace and security.

2. Such agreement or agreements shall govern the numbers and types of forces, their degree of readiness and general location, and the nature of the facilities and assistance to be provided.

3. The agreement or agreements shall be negotiated as soon as possible on the initiative of the Security Council. They shall be concluded between the Security Council and Members or between the Security Council and groups of Members and shall be subject to ratification by the signatory states in accordance with their respective constitutional processes.

*Article 44*

When the Security Council has decided to use force it shall, before calling upon a Member not represented on it to provide armed forces in fulfilment of the obligations assumed under Article 43, invite that Member, if the Member so desires, to participate in the decisions of the Security Council concerning the employment of contingents of that Member's armed forces.

*Article 45*

In order to enable the United Nations to take urgent military measures, Members shall hold immediately available national air-force contingents for combined international enforcement action. The strength and degree of readiness of these contingents and plans for their combined action shall be determined within the limits laid down in the special agreement or agreements referred to in Article 43, by the Security Council with the assistance of the Military Staff Committee.

*Article 46*

Plans for the application of armed force shall be made by the Security Council with the assistance of the Military Staff Committee.

*Article 47*

1. There shall be established a Military Staff Committee to advise and assist the Security Council on all questions relating to the Security Council's military requirements for the maintenance of international peace and security, the employment and command of forces placed at its disposal, the regulation of armaments, and possible disarmament.

2. The Military Staff Committee shall consist of the Chiefs of Staff of the permanent members of the Security Council or their representatives. Any Member of the United Nations not permanently represented on the Committee shall be invited by the Committee to be associated with it when the efficient discharge of the Committee's responsibilities requires the participation of that Member in its work.

3. The Military Staff Committee shall be responsible under the Security Council for the strategic direction of any armed forces placed at the disposal of the Security Council. Questions relating to the command of such forces shall be worked out subsequently.

4. The Military Staff Committee, with the authorization of the Security Council and after consultation with appropriate regional agencies, may establish regional sub-committees.

Pg 4 of 4



*Article 48*

1. The action required to carry out the decisions of the Security Council for the maintenance of international peace and security shall be taken by all the Members of the United Nations or by some of them, as the Security Council may determine.

2. Such decisions shall be carried out by the Members of the United Nations directly and through their action in the appropriate international agencies of which they remembers.

*Article 49*

The Members of the United Nations shall join in affording mutual assistance in carrying out the measures decided upon by the Security Council.

*Article 50*

If preventive or enforcement measures against any state are taken by the Security Council, any other state, whether a Member of the United Nations or not, which finds itself confronted with special economic problems arising from the carrying out of those measures shall have the right to consult the Security Council with regard to a solution of those problems.

*Article 51*

Nothing in the present Charter shall impair the inherent right of individual or collective self-defence if an armed attack occurs against a Member of the United Nations, until the Security Council has taken measures necessary to maintain international peace and security. Measures taken by Members in the exercise of this right of self-defence shall be immediately reported to the Security Council and shall not in any way affect the authority and responsibility of the Security Council under the present Charter to take at any time such action as it deems necessary in order to maintain or restore international peace and security.

CHAPTER VIII

REGIONAL ARRANGEMENTS

*Article 52*

1. Nothing in the present Charter precludes the existence of regional arrangements or agencies for dealing with such matters relating to the maintenance of international peace and security as are appropriate for regional action provided that such arrangements or agencies and their activities are consistent with the Purposes and Principles of the United Nations.

2. The Members of the United Nations entering into such arrangements or constituting such agencies shall make every effort to achieve pacific settlement of local disputes through such regional arrangements or by such regional agencies before referring them to the Security Council.

3. The Security Council shall encourage the development of pacific settlement of local disputes through such regional arrangements or by such regional agencies either on the initiative of the states concerned or by reference from the Security Council.

4. This Article in no way impairs the application of Articles 34 and 35.

**CERTIFICATE OF SERVICE**

I, Fawzi Mustafa Assi, hereby certify that I have served a true and correct copy of the following:

An original § 2255 motion and an original separate motion for an assignment of a new judge; both original copies go to the Clerk of the Court, an additional copy of each go to the Judge and an additional copy of each go to the Prosecutor, Mr. Bob Cares.

I declare, under penalty of perjury (Title 28 U.S.C. § 1746), that the foregoing is true and correct.

Dated this 22nd day of October, 2012.

Fawzi Mustafa Assi
6029 Kenilworth St.
Dearborn, MI 48126

FILED
2012 OCT 25 A 11: 28
U.S. DIST. COURT CLERK
EAST. DIST. MICHIGAN
DETROIT